## Coy et al. v. Griesenbroker.

June 1, 1943.

As Modified on Denial of Rehearing Oct. 12, 1943.

330

 

Barbour & Bassman for appellants.

Benton & Benton for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Reversing.

On February 4, 1941, appellee filed his petition making defendants, Newton Coy, Stewart Berkley and their respective wives. Appellee at the time 68 years of age, without property, and suing as a pauper charged that in May 1931 he was fraudulently induced by defendants to enter into a contract, under which he in good faith assigned in blank to defendants Coys a deposit and investment in two separate Building and Loan Associations, totaling $4,013.04. The books were delivered to the Coys who agreed that they would purchase real estate in Campbell County, a tract of 20 acres, and would apply the sum above named as a down payment.

It was agreed that the Coys would obtain a conveyance, reserving to plaintiff a homestead interest in the property; to support him during his life, and pay him $1 per week for spending money while he lived. As to defendants, Berkleys, it was charged that they entered into a conspiracy with the Coys to cover up the consideration for which the books were delivered to them. The Berkleys pledged the investments to the Newport National Bank for a loan, the proceeds being turned over to the Coys, who in May 1931 applied the money in part payment of the property, taking title to themselves, jointly with the right of survivorship. All without his knowledge or consent.

It was charged that in pretended partial performance of the contract the Coys took him to live with them in the house on the property. He said that the Coys failed to pay him the promised $1 per week; that they, especially the husband, after a short while began to harass and abuse him; forced him to live and sleep in the attic; he was not allowed to eat his meals with them, but ate in the cellar what was left from the family meal.

This treatment continued until plaintiff became ill and unable to endure it, and was obliged to leave in November 1936, and thereafter to rely upon charity.

He said he returned to the home on several occasions between November 1936 and 1940, and slept overnight and ate meals with the family; later he consulted counsel, and for the first time learned that the pass books, which he had turned over to the Coys, had been fraudulently transferred to the Berkleys, and that the Coys had taken title to the real estate, not reserving him his rights.

His prayer was that the contract be rescinded, and he recover of the defendants the sum of $4,013.40, with interest. The defendants (Coys) denied in greater part the allegations of the petition, admitting, however, that they agreed to keep and support appellee and to pay him $1 per week during his lifetime, saying that they did pay him "sums of money" from time to time, and only refused at times to give him money "in order to prevent plaintiff from getting drunk." That he was always treated as a member of the family, and failure of plaintiff to remain and accept their proffered support was due to his voluntary abandonment, without their fault.

The Berkleys denied the greater part of the petition, affirmatively asserting that at the request and with the knowledge and consent of plaintiff, Stewart Berkley did assist the plaintiff in the transfers of the money in the Associations, and in procuring the sum of $4,013.34, which plaintiff directed delivered to the Coys to be used in the purchase of the real estate. Plaintiff replied to each answer, denying so much of each as plead affirmatively. Thereafter defendants amended their answers, and plead the statute of limitations. The Coys filed second amended answer in which they plead counterclaim for board and lodging during the time appellant remained in the household, fixing the reasonable value at $3,025. Replies and rejoinders completed the issues.

Upon submission the jury returned a verdict against Newton Coy and Stewart Berkley in the sum of $4,013.-04, without interest. The two moved for a new trial on the grounds that the verdict was not sustained by the evidence, was excessive and contrary to law; that the court erred in refusing to give peremptory, and in giving faulty instructions.

The questions presented for determination are limited to contentions that a peremptory instruction should have been given both on the question of conspiracy and breach of contract; one instruction given on the issue of breach of contract was erroneous, and lastly that the demurrer of the Berkleys should have been sustained. We note that counsel for appellant says in brief:

"In view of the contention made in reference to the whole case a consideration of the demurrers is hardly necessary."

We agree and refrain from discussion.

Slight objection is made to instruction No. 8-A. The court had in instruction No. 8 told the jury under what circumstances, without a finding of conspiracy, they should find against the Coys for breach of contract. This was followed by 8-A, which set the measure:

"If the jury find for the plaintiff under instruction No. 8, they should award him such sum as will fairly compensate him for his loss resulting from such breach of contract described in Instruction No. 8, the verdict in no event to exceed $4,013.04, with interest thereon at 6% from November 30, 1936, which is the date of the last semblance of performance of the contract as claimed in plaintiff's petition."

The objection here is that the court fixed the date set out in the petition while there was evidence to show that it was not the date when plaintiff left the home. There is proof which leaves open the question as to how long the defendants conceived they were fully performing their contract. It would, therefore, be proper for the jury to determine the date of breach, if they should believe that such occurred, as set out in instruction No. 8, and on the counterclaim instructions.

Appellee at the time of the trial was near the age of seventy. That he was, certainly after the death of his wife, addicted to strong drink is clear and equally as clear that this weakness was at the time of the challenged transaction known to the Coys. Mrs. Coy is a sister, and Mrs. Berkley a daughter of Mrs. Coy. Appellee was married in 1905, and he and his wife worked in more or less menial positions, saving enough money to pay for a home. She died in 1938, and it appears that appellee within a short time went to live with the Coys, in an apartment also occupied by the Berkleys.

In 1930 Stewart Berkley, with appellant's consent, sold the Southgate home for $6,000, for which the purchaser paid $4,500 in cash, executing a note for the balance. Berkley took a commission of $240 (apparently without objection) for negotiating the sale, and after deduction of that and other charges there was left for appellee $4,013.04, and a $1,500 second mortgage note, never paid. This was the money placed in the associations.

During the two years appellant lived with the Coys he had been for a greater portion of the time doing menial labor, but with sufficient funds to pay his board without encroaching on his deposits. Some time in the early part of 1931, the Coys conceived the notion of purchasing a small farm, their idea being it would be better for appellee to live on a farm, and to this he agreed. They looked at several places and selected the 20-acre farm with residence in the suburbs of Newport. The purchase price was more than the Coys could bear, and they proposed that appellee invest his money in the place and he agreed. It is shown that about May 25 he transferred the two building and loan books to Stewart and Esther Berkley. These books were then pledged by Berkley for a bank loan; Berkley, on May 27, gave appellee a check for the sum above named which he endorsed and turned over to his sister, who used it in the purchase of the farm, paying down $500, the balance to be paid in thirty days in cash, and a note for $3,000, title being taken to the Coys.

Appellee's version of the transfer of the two deposit books, not any too definite, was that after it was settled that the farm would be purchased, he agreed to the use of his money, on terms about which there is little disagreement; Coy had made some investigation or effort looking to the cashing of the books and failed. He said that just before the books were turned over to Berkley he and Coy, at the latter's suggestion, went upstairs to Berkley's rooms to talk the matter over. He turned the books over to Berkley, but insisted that he was to have "lifetime keep," a matter which Berkley understood, since he says appellee then said, "All I want is a home for the rest of my life, my Junior Order and my burial association dues paid."

Appellee said that without much discussion, or much that he could recall, Berkley asked him if he had the

pass books, and he replied that he had, and went to his room and brought them up and gave them to Berkley. He admittedly signed the two transfers, and said: ''Won't you have any trouble in getting the money;'' Berkley replied, ''No, I will get it,'' and appellant said, ''Go and get it and pay it off.'' He said that when he turned the books over to Berkley it was with the purpose of procuring the money to help in the purchase of the farm.

Up to this point it may be said that because the Coys were to buy the farm, and the books were turned over to Berkley, who pledged them to a bank for a loan, depositing the money to his credit and giving appellant a check which was afterwards used by the Coys in the farm purchase, might create a suspicion of conspiracy. It does no more than that. It does not appear that the Berkleys had aught to do with the writing of the deed, or in suggesting its terms. Coys' version of the book transfer was that appellant himself had taken the books to Berkley prior to the time of the transfer, saying very little about why the transfer was made, and the transaction handled in the manner detailed. Mrs. Coy said that appellant went to get his money, following his agreement to go in with them in the farm purchase, and ''they would not give it to him.'' Appellee says he did not make demand for the money. She says he went up later and talked to Berkley; she was not present at the time they met, if they did meet; that she was present when the transfer was made and its effect was explained to appellee, who expressed the notion that all he wanted was his maintenance, burial association dues, and a little spending money.

Berkley says that after the agreement to purchase was made, appellee tried to get the money on his loan books, but was unsuccessful. He asked Berkley to see if he could get the money and Berkley agreed to try. It seems that the loan companies would not give the cash at the time because of the nearness of a dividend period. Berkley then went to the bank and arranged for a loan, the banker suggesting that the books be assigned to him (Berkley) and he negotiate the loan. The total loan was for $3,900, which after discount netted $3,831. In addition to the books deposited as collateral, Berkley put up a building and loan book evidencing a small bal-

ance, and a check against his account to meet the check for $4,013.04.

The issue relating to breach of contract presents another state of facts in which it appears the Berkleys had nothing to do. Appellee testifies that he and the Coys looked at several places with a view to purchase; that they finally decided on the 20 acre place. "We were both satisfied. I told her I would help her along with it." Appellee, in a rambling way, contended that it was not until shortly before filing his suit, and after the treatment he received in the Coy home became so unbearable that he had to leave and become almost a "panhandler," finally winding up in the Alms House, that he discovered the deed did not protect his claimed right to have a home for his lifetime.

Appellee says that during the time he remained at the farm (until some time in 1936) he did considerable work, assisting in milking, helping with the small farm work, and doing chores. Mrs. Coy (corroborated by others) minimizes the work, and makes it appear that his drinking habits were such that he could not work much. He says that shortly after going to the farm a coolness arose, and because of abuse on the part of Coy, his stay was unpleasant; that he was compelled to sleep in the bathroom, later in an attic which was hot in summer and cold in winter. Mrs. Coy admitted that he was temporarily placed in the bathroom, and when it was repaired he went to the attic, which she says was comfortable. Appellee says that at first he was served his meals with the rest of the family; later he ate in the kitchen or basement. Mrs. Coy says that the only times he did not eat with the family were when he did not come to meals on time, when she would place the food in the warming closet for him. He says he ate the leavings; she says he had the same food, and so on and on.

Briefly he contends that his treatment was unbearable, and the crisis came some time in 1936, when he and Coy had a "rumpus" at the table, and Coy threatened to strike him. This is denied, but it is admitted that there were words passed on account of appellee's release from a job at the post office.

The proof shows that appellee first left in 1936, and slept sometimes in a barber chair in a shop where he was doing menial work, and in automobiles at a garage. Finally he went to an infirmary for treatment, and in

1939 to the Alms House. We fail to find in the record any movement on the part of the Coys to relieve his situation. We have looked to the proof to ascertain if the parties who have title to the home, partly paid for by appellee's money, evinced desire to relieve his situation in any way. We find none, other than the query made on occasions when Mrs. Coy would see him, "Charlie why don't you come back home?" The record shows that in 1938 appellee, made a will bequeathing his property to Mrs. Coy. He also assigned to her his beneficial rights in the Junior Order. It is fair to say that the will was made prior to the purchase of the farm, and that Mrs. Coy was keeping up payments on the policy. It is further fair to say that appellee evinces a strong favoritism for his sister, and showed no feeling toward her throughout the entire time.

As we read the record we are of opinion that there is a lack of sufficient testimony on the part of appellee to show the formation or consummation of a conspiracy. Appellee's testimony is not of that quality which would justify the court in submission of that phase of the case. The court should have sustained wholly the motion of the Berkleys to give peremptory in their favor since there was no sufficient proof upon which to base a verdict for conspiracy or breach of contract, and dismissed the petition in so far as the charged conspiracy on the part of all defendants. It is true that the court submitted proper instruction (with the minor exception noted) as to the liability of the Coys for breach of contract, but it is manifest that since the jury found against Berkley they undoubtedly found against both on the foundation of the conspiracy charge, and the joint judgment followed the verdict.

There is no cross-appeal against either Mrs. Coy or Mrs. Berkley, hence the verdict and judgment are conclusive as to them. We are therefore of the opinion that so much of the court's instruction as related to the charge of conspiracy was prejudicial to Coy; the case developed in such manner as that the court should have submitted to the jury only the matter of breach of contract, coupled with an instruction on the Coy's counterclaim for such services as were rendered to appellee. We have no way of knowing what course the proof may take on another trial. However, if the proof of conspiracy is no stronger the court should eliminate consideration of such charge, and submit on the issue of

breach of contract and counterclaim, the proof warranting submission.

.Judgment is reversed with directions for a new trial consistent with this opinion.